FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Apr 10, 2024

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

AMY B.,[1]

              Plaintiff,

    v.

MARTIN O'MALLEY, Commissioner of
Social Security,[2]

              Defendant.

No.   1:23-cv-03154-EFS

**ORDER REVERSING THE ALJ'S
DENIAL OF BENEFITS, AND
REMANDING FOR FURTHER
PROCEEDINGS**

---

[1] For privacy reasons, Plaintiff is referred to by first name and last initial or as "Plaintiff." *See* LCivR 5.2(c).

[2] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, and section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), he is hereby substituted for Kilolo Kijakazi as the defendant.

Due to post-traumatic stress disorder, chronic migraine without aura, chronic neck pain, panic disorder, exertional compartment syndrome in the lower legs, asthma, obesity, and Ehlers-Danlos syndrome, Plaintiff Amy B. claims she is unable to work fulltime and applied for disability insurance benefits.  She appeals the denial of benefits by the Administrative Law Judge (ALJ) on the grounds that the ALJ improperly assessed Plaintiff's credibility, improperly evaluated the medical opinion evidence, and erred at step five as a result of her prior errors. As is explained below, the ALJ erred considering Plaintiff's credibility as to her migraine headaches and erred in evaluating the medical opinions of Anusha Mannava, MD. This matter is remanded for further proceedings.

## I.    Background

In May 2019, Plaintiff filed application for benefits under Title 2, claiming disability beginning May 1, 2019, based on the physical and mental impairments noted above.[3]

After the agency denied Plaintiff benefits, ALJ Debra Denney held a telephone hearing in June 2022 at which Plaintiff appeared with her representative.[4] Plaintiff and a vocational expert testified.[5]

---

[3] AR 259, 353.

[4] AR 77-110.

[5] *Id.*

After the hearing, the ALJ issued a decision denying benefits.[6] The ALJ found Plaintiff's alleged symptoms were not entirely consistent with the medical evidence and the other evidence.[7] As to medical opinions, the ALJ found:

- The opinions of state agency evaluator Bruce Eather, PhD, to be persuasive.

- The opinions of state agency evaluator Howard Platter, MD, to be persuasive.

- The opinions of consultative examiner Lisa Kisenwether, ARNP, to be partially persuasive.

- The opinions of consultative examiner Emma Billings, PhD, to be partially persuasive.

- The opinions of treating neurologist Anusha Mannava, MD, to be generally unpersuasive.

- The opinions of treating physician Charles Bulfinch, DO, to be generally unpersuasive.

- The opinions of treating therapist Martha Burns, LMFT, to be generally unpersuasive.[8]

---

[6] AR 15-43.  Per 20 C.F.R. § 404.1520(a)–(g), a five-step evaluation determines whether a claimant is disabled.

[7] AR 26-35.

[8] AR 33-35.

The ALJ also found the third-party statement of Plaintiff's fiancé, William Leitzel, to be less persuasive than the medical opinions.[9]

As to the sequential disability analysis, the ALJ found:

- Plaintiff met the insured status requirements through December 31, 2024.

- Step one: Plaintiff had not engaged in substantial gainful activity since May 1, 2019, the alleged onset date.

- Step two: Plaintiff had the following medically determinable severe impairments: migraines, asthma, Ehlers-Danlos syndrome, obesity, depression, and anxiety.

- Step three: Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.

- RFC:  Plaintiff had the RFC to perform a full range of sedentary work with the following exceptions:

  [Plaintiff] can lift twenty pounds occasionally and ten pounds frequently; can stand, walk, and sit all six hours in an eight-hour day, with normal breaks; should avoid concentrated exposure to cold, heat, and humidity; no more than occasional exposure to fumes, dusts, odors, unprotected heights, and fast moving machinery; no work on ladders, ropes, or scaffolds; can maintain concentration, persistence, and pace for two hours before needing a break; needs a quiet, characterized as office level, noise environment; can tolerate brief, occasional interactions with coworkers and supervisors and no more than

---

[9] AR 35.

very brief to no interaction with the public; should not be assigned teamwork; can tolerate routine changes; and can avoid workplace hazards to complete a normal workday.

- Step four: Plaintiff is unable to perform past relevant work of a telemarketer, reservations agent, customer service supervisor, and sales director.

- Step five: considering Plaintiff's RFC, age, education, and work history, Plaintiff could perform work that existed in significant numbers in the national economy, such as a routing clerk (DOT # 222.687-022), and a silver wrapper (DOT # 318.687-018).[10]

Plaintiff timely requested review of the ALJ's decision by the Appeals Council and now this Court.[11]

## II.    Standard of Review

The ALJ's decision is reversed "only if it is not supported by substantial evidence or is based on legal error,"[12] and such error impacted the nondisability determination.[13] Substantial evidence is "more than a mere scintilla but less than a

---

[10] AR 20-37.

[11] AR 257.

[12] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012). *See* 42 U.S.C. §§ 405(g), 1383(g).

[13] *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) ), *superseded on other grounds by* 20 C.F.R. § 404.1520(a) (recognizing that the court may not reverse an

1    preponderance; it is such relevant evidence as a reasonable mind might accept as

2    adequate to support a conclusion."[14]

### III.    Analysis

Plaintiff seeks relief from the denial of disability on three grounds. She

argues the ALJ erred when evaluating Plaintiff's subjective complaints, erred when

evaluating the medical opinion evidence, and erred at step five as a result of the

prior two errors.  The Commissioner argues that the ALJ reasonably discounted

Plaintiff's subjective complaints, properly evaluated the opinions of the treating

sources pursuant to the new regulations, and properly relied on vocational expert

testimony at step five.[15]  The Court disagrees with the Commissioner as to the

ALJ's consideration of Plaintiff's subjective complaints regarding her migraine

_____

ALJ decision due to a harmless error—one that "is inconsequential to the ultimate

nondisability determination").

[14] *Hill*, 698 F.3d at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir.

1997)). *See also Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The

court "must consider the entire record as a whole, weighing both the evidence that

supports and the evidence that detracts from the Commissioner's conclusion," not

simply the evidence cited by the ALJ or the parties.) (cleaned up); *Black v. Apfel*,

143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does

not indicate that such evidence was not considered[.]").

[15] ECF No. 12.

1    headaches and the ALJ's consideration of Dr. Mannava's opinions. As is explained

2    below, the ALJ's analysis contains consequential error as to these two issues.

3    **A.    Symptom Reports: Plaintiff establishes consequential error.**

4        Plaintiff argues the ALJ failed to provide valid reasons for discounting

5    symptom reports and testimony that her impairments of migraine headaches and

6    Ehlers-Danlos syndrome made it difficult for her to engage in any physical activity.

7    The ALJ offered several reasons for discounting Plaintiff's symptom reports—each

8    reason is addressed below.

9        1.    <u>Standard</u>

10        The ALJ must identify what symptom claims are being discounted and

11    clearly and convincingly explain the rationale for discounting the symptoms with

12    supporting citation to evidence.[16] This requires the ALJ to "show his [or her] work"

13

---

14    [16] *Smartt v. Kijakazi*, 53 F.4th 489, 499 (9th Cir. 2022). Factors to be considered by

15    the ALJ when evaluating the intensity, persistence, and limiting effects of a

16    claimant's symptoms include: 1) daily activities; 2) the location, duration,

17    frequency, and intensity of pain or other symptoms; 3) factors that precipitate and

18    aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any

19    medication the claimant takes or has taken to alleviate pain or other symptoms; 5)

20    treatment, other than medication, the claimant receives or has received for relief of

21    pain or other symptoms; 6) any non-treatment measures the claimant uses or has

22    used to relieve pain or other symptoms; and 7) any other factors concerning the

23

and provide a "rationale . . . clear enough that it has the power to convince" the reviewing court.[17]

When examining a claimant's symptoms, the ALJ utilizes a two-step inquiry. "First, the ALJ must determine whether there is objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."[18] Second, "[i]f the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if [the ALJ] gives 'specific, clear and convincing reasons' for the rejection."[19] General findings are insufficient; rather, the ALJ must identify what symptom claims are being discounted and what evidence undermines these claims.[20] "The clear and convincing standard is the most demanding required

---

claimant's functional limitations and restrictions due to pain or other symptoms. Soc. Sec. Rlg. 16-3p, 2016 WL 1119029, at *7; 20 C.F.R. § 404.1529(c); *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014).

[17] *Smartt v. Kijakazi*, 53 F.4th 489, 499 (9th Cir. 2022) (alteration added).

[18] *Molina*, 674 F.3d at 1112.

[19] *Ghanim* 763 F.3d at 1163(quoting *Lingenfelter*, 504 F.3d at 1036).

[20] *Id*. (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995), and *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (requiring the ALJ to sufficiently explain why he discounted claimant's symptom claims)).

in Social Security cases."[21] Therefore, if an ALJ does not articulate specific, clear, and convincing reasons to reject a claimant's symptoms, the corresponding limitations must be included in the RFC.[22]

2.    Plaintiff's Testimony

On June 14, 2022, Plaintiff appeared with her attorney for a hearing before ALJ Debra Denney.[23]  Plaintiff testified and a vocational expert testified.[24] Plaintiff testified that she lived with her fiancé and he was the sole income for their household.[25] She said that she could not work primarily because of migraine headaches.[26] She said they are easily triggered and she cannot maintain friendships and hold conversations because of the migraines.[27] She has double

_____

[21] *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

[22] *Lingenfelter*, 504 F.3d at 1035 ("[T]he ALJ failed to provide clear and convincing reasons for finding Lingenfelter's alleged pain and symptoms not credible, and therefore was required to include these limitations in his assessment of Lingenfelter's RFC.").

[23] AR 77-110.

[24] *Id.*

[25] AR 84.

[26] AR 85.

[27] *Id.*

vision so reading triggers migraines, but they are also triggered by smells, sounds, and lighting.[28] She has Ehlers-Danlos, which causes problems in her joints as well.[29] She said that Dr. Bulfinch believes that Ehlers-Danlos is a definite diagnosis based on information from a local genetics program.[30] She can drive within a five mile radius.[31]

Plaintiff testified that from 2006 through 2016 she worked from home for Royal Caribbean call center.[32] They gave her an office with climate control, special lighting, the ability to attend meetings remotely, and flexibility in her schedule.[33] When at Royal Caribbean, she was a director and managed managers.[34] She left and took a job with less responsibility thinking that it might alleviate her migraine headaches, but she was fired in less than 90 days because they did not offer accommodations.[35] She kept falling asleep in meetings and when driving and left for safety reasons and briefly worked in a pet store and later as a self-employed dog

---

[28] *Id.*

[29] *Id.*

[30] AR 86.

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] AR 87.

[35] *Id.*

walker and pet sitter.[36] She then worked for a hotel supply company but left after a year because she could not hustle and made only one sale.[37] She received unemployment during the pandemic on the advice of a counselor.[38] When she applied for unemployment, she certified that she was able to work and applied for jobs and attended about 6 job interviews in 2021.[39] None of the interviewers offered her a job after she told them she needed accommodations.[40]

Plaintiff said she sees Dr. Bulfinch every four months for Ehlers-Danlos and that he is mainly monitoring her condition and prescribing medication.[41] She also sees Dr. Mannava for her migraine headaches.[42] She said mostly she is treated by Dr. Mannava with medication and recently had a brain MRI which showed idiopathic intercranial hypertension, so she would be given a new medication.[43] She has not been given Botox injections due to a phobia of needles.[44] She said that

---

[36] AR 88.

[37] AR 89.

[38] *Id.*

[39] AR 90.

[40] AR 91.

[41] *Id.*

[42] *Id.*

[43] AR 92.

[44] *Id.*

1    she will usually sleep until 10:00 am, then spend an hour stretching or meditating,

2    and then for the next few hours will schedule appointments or do small errands.[45]

3    She will have cereal for breakfast and will make dinner with her fiancé because

4    she cannot use a knife.[46] She said that she used to cry throughout the day because

5    she was frustrated doctors had not diagnosed her condition but no longer cries

6    daily.[47] She does not read or use computers because they trigger migraines.[48] She

7    stated that she can do most household chores, but cannot use her thumbs, and that

8    she showers only three times a week because heat causes headaches, and she no

9    longer gardens because of joint pain.[49]

10        Plaintiff said that stress causes her headaches and that she used to get

11    counseling but was no longer in counseling because she thinks her issues are

12    physical.[50] She said she lives with her fiancé but her mother is moving closer to

13    help with her care.[51] She said she has not scheduled her wedding because her

----

[45] AR 92-93.

[46] AR 93.

[47] *Id.*

[48] *Id.*

[49] AR 94.

[50] AR 95.

[51] AR 96.

symptoms aren't controlled and  it is hard to plan around that.[52] She said that she does not read or use computers because it triggers migraines.[53] She said that she can't work from home because those jobs are mostly computer-based work.[54] She said she also would not be able to work in a warehouse because of the noise, lighting, and smells and the fact that it would require repetitive motions.[55] Plaintiff testified that headaches are not as painful as migraines and are on both sides or her head.[56] She said she gets headaches about three weeks in a month and gets migraines three to six times in a month.[57] She said that she has tried six abortive medications but they did not work and that she has tried treatments including physical therapy, acupuncture, massage, chiropractic, and craniosacral therapy that did not work.[58] She can only drive for five miles or less because she will faint at times or fall asleep due to her conditions.[59]

---

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] AR 97.

[56] *Id.*

[57] AR 97-98.

[58] AR 98.

[59] *Id.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

3.    Medical Records

Because Plaintiff only challenges the ALJ's consideration of her subjective

complaints and the medical opinions as to physical conditions, the Court only cites

to relevant medical evidence regarding physical issues.

On January 19, 2018, Plaintiff presented to Kaylee English, DC.[60] Joint

restriction was noted in the cervical spine with right rotation and left lateral

flexion; in the thoracic spine with extension; in the lumbar spine with right

rotation at the L1-2 and L2-3 levels and with left rotation at the L4-5 level; and at

the left SI joint with flexion.[61] Dr. English diagnosed segmental and somatic

dysfunction in the cervical, thoracic and lumbar spine; segmental and somatic

dysfunction in the pelvic region; segmental and somatic dysfunction of the upper

and lower extremities; pain in the left ankle; cervicalgia; and myalgia.[62]

Dr. English opined that Plaintiff's prognosis was poor due to poor at-home

compliance, poor posture, poor biomechanics, and prolonged sitting.[63]  On March

22, 2018, Plaintiff presented with reports that she felt good overall, with pain in

---

[60] AR 434.

[61] *Id.*

[62] *Id.*

[63] AR 435.

her right hip and no migraines since her last visit.[64]  Plaintiff's examination yielded similar findings and her diagnoses were unchanged.[65]

On September 5, 2018, Plaintiff presented to David Higginbotham, MD, for a possible broken foot and to have ADA paperwork completed.[66] An X-ray revealed fracture of the proximal PIP joint, which did not require casting but required that Plaintiff wear a hard soled shoe.[67] Plaintiff also complained that her anxiety disorder was worse in winter.[68]  Dr. Higginbotham increased Plaintiff's dosage of Alprazolam.[69]

On June 3, 2019, Plaintiff presented to Tyler Chisholm, MD with complaints of infection in her finger after being pricked with a rose.[70] She also requested a referral for headaches and a psychiatrist and help filling out a disability form.[71] On

---

[64] AR 437.

[65] *Id.*

[66] AR 448.

[67] *Id.*

[68] AR 449.

[69] *Id.*

[70] AR 559.

[71] *Id.*

examination, there was a nodule at the first PIP joint.[72] Otherwise, Plaintiff's examination was within normal limits and she ambulated well.[73]

On July 1, 2019, Plaintiff presented to PA Amanda Price to establish care.[74] Plaintiff reported she was in good health and had no childhood illnesses.[75] Plaintiff reported a rose thorn in her fingertip; neck pain of several years after falling from a horse; PTSD resulting from childhood trauma; anxiety; depression well-controlled on medication; 3-4 migraines a month, related to stress and hormones; exertional compartment syndrome in her shins; and a phobia of needles.[76] On examination, mood and affect were normal, she appeared well and in no distress and thought and speech were congruent.[77] PA Price diagnosed migraine with aura, not intractable; neck pain; PTSD, which PA Price declined to treat; a retained foreign body; a severe phobia of needles.[78]

On July 15, 2019, Plaintiff presented to Leonard Galloway, MPT, of Aegis Physical Therapy for evaluation, reporting that several months earlier she had an

---

[72] AR 560.

[73] AR 562.

[74] AR 565.

[75] AR 566.

[76] *Id.*

[77] AR 569.

[78] AR 570-571.

exacerbation of a prior neck injury and had pain radiating into her left arm to the elbow.[79] Sensation was intact in all myotomes but trigger points were noted on palpation in the sub-occipital, cervical paraspinal and upper trapezius regions.[80] Plaintiff complained that her decreased range of motion was limiting her daily activities.[81] Between 1996 and current date, she had been prescribed multiple medications for mental health reasons.[82]

On August 12, 2019, Plaintiff presented to PA Price for follow-up.[83] On examination, she denied headache, was in no distress, and had all normal findings, including normal mood and affect.[84]

On August 21, 2019, Plaintiff presented to Stephen Davis, PT, of Lakeview Spine Therapy for evaluation.[85] Plaintiff described long-standing neck pain which is intermittent and can go as much as nine months without symptoms, as well as three different types of headache symptoms with one being associated with neck

---

[79] AR 472.

[80] AR 473.

[81] *Id.*

[82] *Id.*

[83] AR 571.

[84] AR 573.

[85] AR 535.

DISPOSITIVE ORDER - 17

tension.[86] On examination, Plaintiff had normal gait and posture, with limited range of motion in the cervical and lumbar spine.[87] A week later, Plaintiff presented to PT Davis for treatment of neck pain and he noted progress with treatment.[88] On September 3, 2019, Plaintiff presented to PT Davis with midthoracic tightness due to economic stress.[89] On September 5, 2019, Plaintiff presented to PT Davis with left-sided muscle tension.[90] On September 10, 2019, Plaintiff presented to PT Davis with a back of head and right frontal headache.[91] PT Davis noted that after treatment Plaintiff's left-sided neck tension subsided but her right headache remained.[92] On September 12, 2019, Plaintiff reported that she wakes at night with deep ache in her neck.[93] On September 19, 2019, PT Davis noted left-sided lateral neck pain with right-side bending.[94] On October 1, 2019, PT Davis noted

---

[86] Id.

[87] Id.

[88] AR 534.

[89] AR 533.

[90] AR 531.

[91] AR 530.

[92] Id.

[93] AR 528.

[94] AR 526.

stiffness in the right scapular.[95]On October 3, 2019, Plaintiff was seen for neck pain.[96] On October 8, 2019, Plaintiff presented to PT Davis with neck pain.[97] PT Davis noted that Plaintiff's range of motion had improved and her right and left side were balanced in terms of symptoms.[98]  On October 10, 2019, Plaintiff presented to PT Davis, with suboccipital tightness.[99] PT Davis found that her condition was improving.[100]

On October 1, 2019, Plaintiff presented to PA Price with complaints of diarrhea.[101]  She reported that she was going to physical therapy for her neck and it was moderately helpful but asked for a different muscle relaxer.[102] Plaintiff denied headache and on examination she was in no distress and all findings were within normal limits.[103]

---

[95] AR 525.

[96] AR 524.

[97] AR 523.

[98] *Id.*

[99] AR 522.

[100] *Id.*

[101] AR 577.

[102] *Id.*

[103] AR 578-579.

1    On November 13, 2019, Plaintiff presented to PA Price and reported that in

2    the past doctors had prescribed Vicoprofen but she could not find a doctor who

3    would prescribe both narcotic and benzodiazepine medication together and she

4    would like a referral to pain management.[104] Plaintiff reported that since stopping

5    physical therapy, her neck pain had worsened.[105] Plaintiff denied headache and on

6    examination she was in no distress and all findings were normal.[106] PA Price

7    started that an MRI had been negative and she did not feel comfortable prescribing

8    narcotics but referred Plaintiff to pain management.[107]

9    On December 5, 2019, Plaintiff was examined by Lisa Kisenwether, ARNP,

10   at the request of the Commissioner.[108] Plaintiff's main complaints were chronic

11   PTSD; migraine without aura; cervical pain, chronic; panic disorder; external

12   compartment syndrome, lower leg, chronic bilaterally; asthma, stable on

13   medication; and depression, stable on medication.[109]  Plaintiff described PTSD

14   which was increasing in severity; migraines that feel like a pick in the temple,

15   associated with light sensitivity, nausea and loss of consciousness; neck pain that

16

17   [104] AR 580.

18   [105] *Id.*

19   [106] AR 581-582.

20   [107] AR 582-583.

21   [108] AR 537.

22   [109] AR 537.

23

DISPOSITIVE ORDER - 20

is exacerbated by lifting, staying stationary, and reaching overhead; panic attacks; and exertional compartment syndrome in her lower legs.[110] She reported that she could care for herself and her two dogs, but that she no longer does grocery shopping, yard work, or horse riding.[111] On examination, Plaintiff was able to walk without assistance, able to get on and off the exam table with no assistance or difficulty, able to sit and rise without difficulty, able to tie and untie her shoes, able to make a fist with both hands, able to touch her thumb to her fingers, able to pick up a coin and able to use buttons and a zipper.[112] Her grip was normal.[113] Plaintiff was able to tandem walk, walk on heels and toes, hop, bend, squat, and stand on one leg.[114] Her finger-to-nose and heel-to-shin test was normal; station was normal, gait was normal; Romberg test was negative; and she did not use an assistive device.[115] Plaintiff had negative straight-leg raising, normal range of motion and no atrophy, spasm or joint deformity.[116] Plaintiff had full strength in lower and upper extremities; and range of motion was normal in the neck, back, shoulders, elbows,

---

[110] AR 537-538.

[111] AR 538-539.

[112] AR 540.

[113] *Id.*

[114] AR 541.

[115] *Id.*

[116] *Id.*

wrists, thumbs, hips, knees, and ankles.[117] Plaintiff's cardiovascular, respiratory, and neurological systems were normal; and her abdomen was positive only for tenderness in the right lower quadrant.[118] There was muscle tenderness noted on palpation of the spine but no trigger points.[119] In the cervical spine, there was straightening and loss of the lordotic curve, secondary to spasm and a slight 1-2mm anterolisthesis of C4/C5.[120] ARNP Kisenwether diagnosed PTSD, chronic; migraine without aura; cervical pain, chronic; panic disorder; external compartment syndrome, lower leg, chronic/bilateral; asthma, stable with medication; and depression, stable with medication.[121] ARNP Kinsenwether opined that Plaintiff can stand or walk for eight hours, sit for eight hours, and lift and carry ten pounds frequently and twenty pounds occasionally. [122] She opined that Plaintiff had no limitation in climbing, balancing, stooping, kneeling, crouching, and crawling.[123] She opined that Plaintiff could reach occasionally and should avoid exposure to

---

[117] *Id.*

[118] *Id.*

[119] AR 542.

[120] AR 542.

[121] *Id.*

[122] AR 542-543.

[123] AR 543.

1    unprotected heights, heavy machinery, chemicals, gases, dusts, fumes. and

2    excessive noise.[124]

3        On January 15, 2019, Plaintiff presented to PA Price.[125]  PA Price wrote:

4    Patient is a 37-year-old female who presents to the clinic today for follow-up.  Patient begins the appointment
     with a long list of symptoms and previous diagnosis that she would like to address.  They are as follows:
     Chronic exertional compartment syndrome, bilateral bursitis, bilateral tendinitis in the knees, psychogenic
5    nonepileptic seizures, panic disorders, selective mutism, separated ribs, severe in unknown cause of bruising,
     joint hypermobility, double vision, migraines, skin rash, bloating diarrhea, neck pain, dislocated shoulders
6    bilaterally, thumb pain, tilted uterus, tailbone pain, sprained ankles, hip dislocation bilaterally, knees locking
     bilaterally, tooth resorption, "odd medication side effects ", pes planus, bilateral stress fractures in both feet at
     25 years old, difficulty holding pencil, low body temperature, low blood pressure, sensitivity to heat and cold,
7    history of fainting, fatigue, idiopathic hypersomnia, wrist pain, chronic mild mid back pain, ankle sprain in hip
     dislocation at 12 years old, bedwetting until age 10 years old, intermittent hand tremor, frequent urination,
8    "clumsy joints giving out ", palpitations, PVCs, perioral dermatitis, ketosis pilaris.

     Patient reports that she would like to be evaluated for Ehlers-Danlos syndrome.  Patient does endorse a history
9    of joint hypermobility.  She states that she has velvety type skin on the inner parts of her arms.  She endorses
     dry a her abdomen, likely secondary to pregnancy.  She does endorse easy bruising.  She reports that any
     time she cuts herself that she heals poorly.  Patient has not had any lab work due to significant severe needle
10   phobia.  She denies history of varicose veins, history of heart murmur.[AP.2]

11       PA Price noted that Plaintiff denied headache and was in no distress on

12   examination with normal findings that included the fact that she had a negative

13   thumb test, no hypermobility in the joints of her hands or elbows, and that knees

14   could not be easily dislocated.[126] PA Price advised Plaintiff of the criteria for

15   Ehlers-Danlos and noted that she highly suspected hypochondriasis, and

16   considered that Plaintiff was applying for SSD.[127] PA Price noted that she refused

17   to prescribe opioid pain medication and noted that Plaintiff was told she was not a

18   _____

19   [124] *Id.*

20   [125] AR 584.

21   [126] AR 585-586.

22   [127] AR 586.

23

candidate for a pain management clinic because of her desire to take opioids as necessary and not on a schedule.[128]

On January 20, 2019, Plaintiff reported to PA Price for follow-up, requesting referral for Ehlers-Danlos syndrome.[129] On examination, Plaintiff denied headache, was in no distress, and all findings were within normal limits. PA Price noted that she believed there was a "significant component for psychiatric care" and noted that "I am concerned that she provides most of the history that is word for word meeting diagnostic criteria of Ehlers-Danlos."[130] PA Price noted further that she was concerned that Plaintiff had brought a sheet in which she had marked every subjective and objective finding positive before there was even an examination performed, including unfounded medical diagnosis of mitral valve prolapse and aortic root dilation, despite negative echocardiogram.[131]

On October 16, 2019, Plaintiff presented to Tony Lee, MD of Washington Neurology.[132] Plaintiff reported migraines of a 10/10 severity occurring 16+ times a month and lasting 12 hours.[133] Plaintiff reported that she had tried multiple

---

[128] AR 586-587.

[129] AR 588.

[130] AR 590.

[131] *Id.*

[132] AR 613.

[133] *Id.*

medications including triptans, Topamax, tizanidine, soma, methocarbamol, nortriptyline, Cymbalta, Gabapentin, and Lyrica, but that Vicodin worked.[134] On examination, Plaintiff reported chest palpitations, shortness of breath, back pain, anxiety, depression, and memory loss.[135] She was well-groomed; was oriented to person, place, and time, and had normal behavior; had intact recent and remote memory, attention span, and concentration; had full range of motion without pain in the head and neck; had normal breathing; had normal cardiovascular findings; had normal gait and station; had normal musculoskeletal findings; and had a normal cranial nerve assessment.[136] Dr. Lee diagnosed Plaintiff with Migraine with aura, not intractable, without migrainosus; post traumatic stress disorder, chronic; major depressive disorder, recurrent severe without psychotic features; and fear of injections or transfusions.[137]

On November 15, 2019, Plaintiff reported to PT Davis that she had a migraine the day prior and was tired.[138] On December 4, 2019, Plaintiff presented to PT Ryan Sprunger and reported that she had neck pain at a 7/10 and that it

---

[134] *Id.*

[135] *Id.*

[136] AR 614.

[137] AR 614.

[138] AR 633.

goes to a 10/10.[139] She said that used to shop at small stores but now has to shop at Walmart or Costco due to financial concerns and has no friends nearby because she recently moved.[140] She reported that she lost her job in 2016, and has not been able to recover.[141] On examination, she had normal gait and posture, had full mobility to sit and rise and get on the exam table without assistance, and she was tender at trigger points in the left scalenes and the right upper thoracic region.[142] PT Springer assessed Plaintiff with chronic neck pain associated by Plaintiff with intermittent migraines triggered by anxiety, smells, lights, stress, or physical exertion.[143] On December 10, 2019, Plaintiff presented to PT Sprunger.[144] She reported having a migraine the day prior but had fully recovered.[145] On January 7, 2020, Plaintiff presented to PT Davis and reported that she had neck pain 50% of the time and that it has improved but that since her migraine medication was not refilled she now was having 4-6 migraines a month.[146] On January 14, 2020,

---

[139] AR 618.

[140] *Id.*

[141] *Id.*

[142] AR 619.

[143] *Id.*

[144] AR 616.

[145] *Id.*

[146] AR 631.

Plaintiff presented to PT Davis, reporting that she had hypermobility and wondered if she had a connective tissue disorder.[147] She reported that her migraines were more severe since her medication was not refilled.[148] On January 21, 2020, Plaintiff presented to PT Davis and complained that insurance would not pay for adequate testing and her health was not being addressed.[149] On January 29, 2020, Plaintiff presented to PT Davis and reported that she remained concerned that she had a connective tissue disorder like Ehlers-Danlos Syndrome.[150] PT David notes left greater than right cervical tenderness with improved relaxation and normal tone following treatment.[151] He noted overall hypermobility.[152]

On January 31, 2020, Plaintiff presented to neurologist Ahusha Mannava, MD, for evaluation of headaches.[153] Plaintiff reported headaches since age 5, and then the onset of migraines in 2000 after she suffered a concussion.[154] Plaintiff

---

[147] AR 629.

[148] *Id.*

[149] AR 625.

[150] AR 623.

[151] *Id.*

[152] *Id.*

[153] AR 746.

[154] *Id.*

reported 31 headaches in a month with 20 severe headaches in a month.[155] They are like a pick in the right temple; occasionally are accompanied by bright spots or a couple hours, light and sound sensitivity, nausea, dizziness, fatigue, and neck tenderness; and are triggered by smell, lights, alcohol, and foods.[156] She reported they are relieved by hydrocodone and sumatriptan helps if taken early.[157] On examination, Plaintiff was in no distress and systems were normal with the exception of bilateral occipital tenderness and stiffness.[158] A detailed neurological examination was normal.[159] Dr. Mannava diagnosed chronic migraine headaches.[160]

On February 27, 2020, Plaintiff presented to Brenna Hayes of Virginia Mason Memoria Hospital for genetic counseling.[161] Ms. Hayes ultimately opined that she could not make a diagnosis and that genetic testing was recommended.[162]

---

[155] *Id.*

[156] *Id.*

[157] *Id.*

[158] AR 748-749.

[159] AR 749.

[160] *Id.*

[161] AR 644-647.

[162] AR 647.

On April 27, 2020, Plaintiff had a follow-up appointment with Dr. Mannava.[163] She refused a trail of Botox due to fear of injections.[164] Plaintiff stopped taking one medication due to dizziness but reported that her migraine frequency decreased from 3-4 a month to 2 per month in the last 2 months with migraines lasting 4-5 days.[165] Plaintiff requested narcotic pain medication, which Dr. Mannava refused to prescribe.[166] Plaintiff was in no distress and a detailed neurological examination was normal.[167] Dr. Mannava diagnosed chronic migraine and post traumatic headaches, intractable.[168] Dr. Mannava added Ubrelvy as a medication.[169]

On June 23, 2020, Plaintiff presented to Charle Bulfinch, DO, to establish care.[170] Plaintiff reported a history of anxiety and depression, migraines treated in the past by narcotics as necessary, and pain in multiple joints related to Ehlers-

---

[163] AR 752.

[164] *Id.*

[165] *Id.*

[166] *Id.*

[167] AR 753.

[168] *Id.*

[169] *Id.*

[170] AR 741.

Danlos.[171] On examination, all findings were normal.[172] Dr. Bulfinch diagnosed Plaintiff with mild intermittent asthma; anxiety; Ehlers-Danlos syndrome, benign hypermobile form; and migraine.[173]

On August 17, 2020, Plaintiff presented to geneticist Susie Ball, MS DCGC, for evaluation of Ehlers-Danlos syndrome.[174]  On August 24, 2020, MS DCGC Ball wrote a narrative letter explaining that she had performed testing on Plaintiff but that because of the restrictions of seeing patients in person she could only verify one of the three criteria necessary to diagnose Ehlers-Danlos syndrome and could not make a diagnosis at that time, but would refer Plaintiff to a geneticist in Oregon or allow her doctor Dr. Bulfinch to make a diagnosis.[175]

On August 31, 2020, Plaintiff presented to Dr. Mannava for follow-up, reporting that she had discontinued all her migraine medications and was getting headaches daily with only 1-2 headache free days a month.[176] On examination, Plaintiff was in no distress and all findings were normal.[177] Plaintiff requested a

---

[171] *Id.*

[172] *Id.*

[173] *Id.*

[174] AR 637-640.

[175] AR 635-636.

[176] AR 755-756.

[177] AR 756.

Cefaly device but was advised that she could try one after a two month trial of Memantine.[178]

On October 7, 2020, Plaintiff presented to Dr. Bulfinch with an injury to her right heel.[179] On examination, all systems were normal, and there was no numbness or weakness of the foot, but there was tenderness on the posterior and lateral aspect of the calcaneus.[180] Dr. Bulfinch noted that he wanted to discuss the report of Susie Ball that Ehlers-Danlos syndrome was possibly a condition but had not been diagnosed due to an inability to fully evaluate Plaintiff.[181] An x-ray showed no fracture and unremarkable soft tissue findings.[182] A follow-up visit on December 11, 2020, yielded similar results.[183]

On January 11, 2021, Plaintiff presented to Jeffrey LeCheminant, DPM, with continued pain in her right heel.[184] Dr. LeCheminant diagnosed Achilles tendinitis and prescribed physical therapy, as rest was not helpful in healing.[185]  At

---

[178] *Id.*

[179] AR 743-744.

[180] *Id.*

[181] AR 743.

[182] AR 745.

[183] AR 810.

[184] AR 819.

[185] *Id.*

a follow-up visit on April 19, 2021, with Dr. Bulfinch, Plaintiff reported that she had taken physical therapy and was wearing a walking shoe but could still not walk for prolonged periods.[186] Dr. Bulfinch prescribed hydrocodone-ibuprofen.[187]

On April 27, 2021, Plaintiff presented to Dr. Bulfinch requesting medication and a prescription for a parking pass, since she was now able to walk a quarter of a mile.[188] Plaintiff advised that she only used the pain medication for migraines if they lasted for more than 6 hours, and that was rare.[189]  On July 20, 2021, Plaintiff presented to Dr. Bulfinch with pain in her neck and foot.[190] Dr. Bulfinch noted that an Ehlers-Danlos support group had suggested carbidopa-levidopa for spasms and he thought it seemed reasonable to prescribe it at Plaintiff's request.[191] He prescribed cabidopa-levidopa, Cymbalta, and hydrocodone-ibuprofen.[192]

On August 12, 2021, Plaintiff was examined by Anita Beck, MD, a specialist in genetic testing.[193] Dr. Beck diagnosed a connective tissue disorder of unknown

---

[186] AR 826.

[187] AR 833.

[188] AR 837.

[189] *Id*.

[190] AR 840.

[191] *Id*.

[192] *Id*.

[193] AR 770.

etiology.[194] On examination, Dr. Beck noted that Plaintiff was distressed only when discussing her connective tissue disorder.[195] Finding regarding Plaintiff's HEENT, neck, thorax, respiratory system, cardiovascular system, abdomen, lymphatic system, and back were all within normal limits.[196] Skin was noted to be soft but not excessively stretchy, and on neurological examination it was noted there was pain with movement but good strength.[197] A musculoskeletal examination revealed that Plaintiff could touch her right thumb to her forearm but not her left; and she did not have hyperextension in her knees or elbows but was able to touch her palms to the ground.[198] Dr. Beck noted that this correlated to a Beighton score of 4/9.[199] Dr. Beck noted that the closest diagnosis she could get to without genetic testing was hypermobile Ehlers-Danlos Syndrome, but it was not a perfect fit, and she could only diagnosis a connective tissue disorder of unknown etiology.[200]

---

[194] *Id.*

[195] AR 772.

[196] AR 772-773.

[197] AR 773.

[198] *Id.*

[199] *Id.* A Beighton Score is a test for joint hypermobility and a score of 4 or more on a scale of 9 is considered positive. Cleveland Clinic, *Beighton Score*, www.clevelandclinic.org (last seen March 26, 2024).

[200] AR 774-775.

On September 29, 2021, Plaintiff presented to Dr. Bulfinch with complaints that she was out of breath and sleeping a lot.[201] She reported that carbidopa-levidopa was helping with her Ehlers-Danlos Syndrome but stated that insurance had denied her medication for hypersomnia.[202]

On November 30, 2021, Plaintiff presented to cardiologist Anindita Chowdhury, MD, on referral from Dr. Bulfinch for mild intermittent asthma.[203] Dr. Chowdhury noted that Plaintiff's main complaint was tiredness and noted deconditioning.[204] Dr. Chowdhury diagnosed chronic shortness of breath, Ehlers-Danlos syndrome, obesity and tiredness, and counseled Plaintiff to lose weight and exercise to reverse deconditioning.[205] A chest x-ray was normal.[206]

On January 24, 2022, Plaintiff presented to Brenna Hayes for follow-up genetic counseling.[207] Ms. Hayes indicated that on August 18, 2020, Plaintiff was seen by Anita Beck, MD, for a genetics medical consultation and that Dr. Beck

---

[201] AR 850.

[202] *Id.*

[203] AR 922.

[204] *Id.*

[205] AR 923-924.

[206] AR 925.

[207] AR 768.

recommended genetics testing.[208] Ms. Hayes explained that the genetic testing was completed and was negative, indicating that no genetic changes were found which would explain Plaintiff's features.[209] Ms. Hayes noted that the test could not rule out Ehlers-Danlos but did not support it.[210]

On February 8, 2022, Plaintiff presented to Dr. Mannava with reports that in January she had pain in her right eye, with colors being off and possibly blurred vision.[211] Dr. Mannava ordered an MRI of the brain and referred Plaintiff to an ophthalmologist.[212]

On February 14, 2022, Plaintiff presented to Richard Ehlers, MD, for a consultation for possible neuritis on Dr. Mannava's referral for possible neuritis and was found to have possible retro bulbar optic neuritis.[213] On examination, all findings were within normal limits.[214] On February 15, 2022, Plaintiff presented to Dr. Bulfinch with paperwork for disability.[215]

---

[208] *Id*.

[209] AR 768-769.

[210] Id.

[211] AR 896-897.

[212] AR 897.

[213] AR 792-793.

[214] *Id*.

[215] AR 876.

On March 16, 2022, Plaintiff presented to Dr. Bulfinch with complaints that she had chest pain and felt a growth in her throat.[216] Dr. Bulfinch referred her to an ENT.[217] An echocardiogram was normal.[218]

On March 18, 2021, an MRI of the brain showed no sign of optic neuritis but showed mild prominence of the fluid surrounding the optic nerve sheath, indicating possible idiopathic intracranial hypertension.[219]

On March 29, 2022, Plaintiff presented to Rick Gross, MD, with complaints of a growth in her throat.[220] Dr. Gross diagnosed a pharyngeal cyst and opined that it should be excised but that a consultation would be needed due to Ehlers-Danlos syndrome.[221] On March 30, 2022, Plaintiff called stating that she reconsidered taking antibiotics and would like them prescribed.[222] On May 9, 2022, Plaintiff returned and was seen by Aaron Shady, DO, who noted that the cyst had resolved without intervention.[223]

---

[216] AR 879.

[217] AR 880.

[218] AR 883-884.

[219] AR 894.

[220] AR 916.

[221] AR 917.

[222] AR 919.

[223] AR 920.

On March 31, 2022, Plaintiff presented to Dr. Mannava for follow-up for headaches.[224] Dr. Mannava noted that in January 2022 Plaintiff had presented with complaints of recent blurred vision, double vision, and difficulty distinguishing colors but that an MRI of the brain had not shown evidence of optic nerve injury or demyelinating disease.[225] On examination, Plaintiff was in no distress and all findings were within normal limits.[226] On May 25, 2022, Plaintiff presented to Dr. Mannava for follow-up.[227] Plaintiff reported that after treatment with Diamox she had a reduction in headaches and had 10 headache free days for the two prior months, and had only 3-4 migraines per month.[228]

### 4.    The ALJ's Findings

The ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effects of her conditions to be only partially consistent with the evidence for two reasons.[229] She states that the first reason was that Plaintiff's allegations were inconsistent with her activities of daily living.[230] The ALJ

---

[224] AR 889.

[225] AR 890.

[226] AR 890-891.

[227] AR 935.

[228] AR 936.

[229] AR 26-33.

[230] AR 26.

articulated:

> First, though the claimant alleged that she is unable to work, she
> nevertheless is able to engage in many significant activities of daily
> living.  This leads the undersigned to believe that she is less limited
> than alleged.  Notably, in her Function Report – Adult (Ex. 3E) the
> claimant reported that she is able to water her lawn, stretch, go on a
> short walk, take a shower, do light chores, and help care for her pets;
> perform her personal care activities with some problems; prepare
> meals half of the time; do household chores, such as, laundry, light
> cleaning, and vacuuming; go outside daily; drive a car and ride in a
> car; go shopping in stores; pay bills, count change, handle a savings
> account, and use a checkbook/money orders; and do hobbies, such as,
> watch movies and read in small increments.[231]

The ALJ then went on to note that Plaintiff had never been fired from a job

for failing to get along with others, had received unemployment benefits by

certifying that she was ready willing and able to work, and had reported that a year

ago she rode horses and was a sales director with 200 employees under her

direction.[232]

The ALJ also found that the Plaintiff's subjective complaints were

inconsistent with the objective evidence and clinical findings.[233]

    5.   <u>Analysis</u>

The Court will address the reasons given by the ALJ to find Plaintiff's

subjective complaints less than credible.

---

[231] AR 26-27.

[232] AR 27.

[233] *Id*.

a.    *The ALJ's consideration of Plaintiff's daily activities*

Plaintiff argues that the ALJ took Plaintiff's daily activities out of context when considering that they were inconsistent with allegations of total disability. The Court agrees that the ALJ has not considered the record as a whole when considering the activities cited by the ALJ.  Plaintiff's primary disabling condition is migraine headaches.  None of the simple activities engaged in by Plaintiff require heavy exertion and she testified that they were performed at times when she was not suffering from a migraine headache and had modified such activities to make them safe for her to perform, such as the fact that she did not drive for more than short distances or use a knife when preparing foods.[234] The ALJ erred in considering sedentary activities as an indication Plaintiff could engage in greater activities particularly in light of Dr. Chowdhury's finding that Plaintiff had suffered from severe deconditioning as a result of her sedentary activities.[235]

The ALJ erred in considering that Plaintiff had not been fired for a job due to difficulty getting along with others but ignoring the fact that Plaintiff had twice been fired from employment due to taking excessive leave because of migraine headaches.[236]

---

[234] AR 93, 98.

[235] AR 923-924.

[236] AR 87, 358.

The fact that Plaintiff had at one point directed 200 people and had been able to ride horses was not a valid consideration for the ALJ to make.  The record clearly reflected that those activities has occurred prior to the alleged onset date, when Plaintiff alleged a worsening in both the frequency and intensity of her migraine headaches.  Additionally, it was not proper for the ALJ to consider that Plaintiff applied for unemployment when such benefits do not require an applicant to assert that they are capable of working full-time, but only part-time.

> b.  _The ALJ's reasoning that Plaintiff's allegations are inconsistent with the medical record._

As is noted above, Plaintiff suffers from two separate conditions for which she has alleged physical disability—migraine headaches and Ehlers-Danlos syndrome. While her diagnosis of Ehlers-Danlos is relatively new and is equivocal according to the medical opinion of Dr. Beck,[237] there was no indication that Plaintiff's allegations regarding the frequency or intensity of her migraine headaches was in question.  Objective medical evidence in the form of an MRI of the brain established that Plaintiff suffered from idiopathic intracranial hypertension, which Dr. Mannava opined to be the source of Plaintiff's migraine headaches.[238] Indeed, the medical record supports that  Plaintiff reported to medical providers that she suffered up to 20 migraine headaches in a month and,

---

[237] AR 768-769.

[238] AR 894, 936.

that at its best level of control, Plaintiff suffered at least 3 migraine headaches a month.[239]

### 6. Summary

Because the ALJ did not give good reasons for discounting Plaintiff's symptom reports about her headaches, a remand is warranted.

## B. Medical Opinion: Plaintiff establishes consequential error

Plaintiff argues the ALJ erred in her evaluation of the medical opinions.[240] Specifically, Plaintiff first argues that the ALJ erred in finding the opinions of Dr. Mannava and Dr. Bulfinch to be not persuasive and instead relying on the opinions of the non-examining state agency evaluators.   The Commissioner argues that Dr. Mannava did not provide a medical opinion and that Dr. Bulfinch's medical opinion was lacking in supportability and consistency.

### 1. Standard

The ALJ was required to consider and evaluate the persuasiveness of the medical opinions and prior administrative medical findings.[241] The factors for

---

[239] AR 936.

[240] An ALJ must consider and articulate how persuasive she found each medical opinion, including whether the medical opinion was consistent with and supported by the record. 20 C.F.R. § 404.1520c(a)–(c); *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).

[241] 20 C.F.R. § 404.1520c(a), (b).

evaluating the persuasiveness of medical opinions and prior administrative medical findings include, but are not limited to, supportability, consistency, relationship with the claimant, and specialization.[242] Supportability and consistency are the most important factors,[243] and the ALJ must explain how she considered the supportability and consistency factors when reviewing the medical opinions and support her explanation with substantial evidence.[244] The ALJ may consider, but is not required to discuss the following additional factors: the source's relationship to Plaintiff such as length of the treatment, purpose of the treatment relation and whether the source examined Plaintiff, as well as whether the source had advanced training or experience to specialize in the area of medicine in which the opinion was being given.[245]

A medical opinion is statement from a medical source about what an individual can still do despite her limitations or restrictions in the abilities to do the following: perform the physical demands of work activities such as standing,

---

[242] 20 C.F.R. § 404.1520c(c)(1)–(5).

[243] *Id*. § 404.1520c(b)(2).

[244] *Id*. § 404.1520c(b)(2); *Woods v. Kijakazi*, 32 F.4th a at 785 ("The agency must articulate . . . how persuasive it finds all of the medical opinions from each doctor or other source and explain how it considered the supportability and consistency factors in reaching these findings.") (cleaned up).

[245] *Id*.

walking, sitting, lifting, carrying, pushing, pulling, and performing manipulative or postural functions; perform the mental demands of work activities such as understanding, remembering, maintaining concentration, persistence, and pace; interacting appropriately with others, and dealing with stress; performing other demands such as seeing, hearing, and using other senses; and the ability to adapt to environmental conditions such as temperature extremes.[246]

2.    Plaintiff's Testimony

The Court hereby incorporates and refers to the Plaintiff testimony summarized above in its analysis of the prior issue.

3.    Relevant Medical Records

The Court hereby incorporates and refers to the relevant medical records summarized above in its analysis of the prior issue.

4.    Analysis

a.    *The ALJ's consideration of Dr. Mannava's opinions regarding Plaintiff's environmental limitations*

Dr. Mannava treated Plaintiff for her migraine headaches and has, according to the medical record, been successful in reducing the frequency and intensity of her migraines.[247] Dr. Mannava's treatment of Plaintiff began on January 31, 2020, and continued throughout the relevant period.

---

[246] 20 C.F.R. § 404.1513.

[247] AR 936.

1        On February 21, 2022, Dr. Mannava completed a questionnaire.[248] She said

2 that Plaintiff had a diagnosis of chronic migraine which she diagnosed based on

3 notes from medical treatment with a neurologist since January 31, 2020.[249]

4 Dr. Mannava stated that the headaches met the criteria of chronic migraine and

5 that her evaluation supports the diagnosis because if examination findings and

6 failed treatment with prior medication, as well as sensitivity to light.[250]

7 Dr. Mannava opined that Plaintiff's function might be limited because lights, noise,

8 movement, and exertion may trigger or worsen headaches.[251]

9        The Court notes that the Commissioner errs in asserting that Dr. Mannava's

10 statements do not constitute a medical opinion.  Dr. Mannava noted specifically

11 that Plaintiff has "significant problems due to light sensitivity and pain" and noted

12 that "function" was limited "as lights, noise and movement/exertion may trigger or

13 worsen headaches."[252]  This constitutes a medical opinion, as Dr. Mannava was

14 clearly rendering a statement regarding Plaintiff's ability to function in

15 environmental conditions.[253]

---

[248] AR 758-759.

[249] AR 758.

[250] *Id.*

[251] *Id.*

[252] *Id.*

[253] *See* 20 C.F.R. § 404.1513.

The ALJ's reasoning is flawed for two reasons. First, the ALJ did not properly consider that Dr. Mannava clearly explained her diagnosis and the fact that she based it upon her own examinations as well as those of the neurologist, Dr. Lee. Additionally, there was little if any analysis as to the supportability of Dr. Mannava's opinions. Moreover, the ALJ failed to consider that Dr. Mannava's opinion was overwhelmingly consistent with and supported by the objective findings in the medical record and the finding of Plaintiff's neurologist.

The records indicate that Plaintiff's function improved following her treatment with medication following a brain MRI indicating intracranial hypertension. A claimant's improvement with treatment is "an important indicator of the intensity and persistence of . . . symptoms."[254] Symptom improvement, however, must be weighed within the context of an "overall diagnostic picture."[255] Here, the record indicates that even after treatment with more effective

---

[254] 20 C.F.R. § 404.1529(c)(3). *See Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits.").

[255] *Holohan v. Massanari*, 246 F.3d1195, 1205 (9th Cir. 2001); *see also Lester v. Chater*, 81 F.3d 821, 833 (9th Cir. 1995) ("Occasional symptom-free periods ... are not inconsistent with disability.").

medication, Plaintiff still experienced at least three to four migraine headaches a month and there is no indication that lights and noise are no longer a trigger.

The ALJ erred by failing to consider both Plaintiff's symptom reports and Dr. Mannava's opinions regarding Plaintiff's "significant" sensitivity to lights. While the ALJ provided for a limitation in the RFC to a work environment that was quiet, and characterized as office level, it made no provision limiting lights, or the use of computer screens.  This is error.

The Court concludes that remand is warranted for the ALJ to properly consider the opinion evidence and to evaluate the record as a whole.

### b.    *The ALJ's consideration of Dr. Bulfinch's opinions*

On February 15, 2022, Dr. Bulfinch completed a medical questionnaire and noted that he diagnosed Plaintiff with Ehlers-Danlos syndrome and migraines based on her subjective reports and the fact that she saw a genetics counselor in the past.[256] When asked about the objective findings supporting his diagnosis, Dr. Bulfinch stated that Plaintiff's skin was a little stretchy and that there are no objective findings for migraines.[257] Dr. Bulfinch stated that Plaintiff would have a decreased ability to use electric screens and decreased exercise tolerance.[258] Dr. Bulfinch competed a Medical Report Form as well, which he stated that

---

[256] AR 760.

[257] *Id.*

[258] *Id.*

Plaintiff was diagnosed with migraines and Ehlers-Danlos.[259] He opined that Plaintiff could sit for 30 minutes at a time and a total of 4 hours; could stand for 15 minutes and stand or walk for a total of less than 2 hours; would need to take 4 breaks a day of 30 minutes to 2 hours; would require a job that allowed alternating between standing and sitting at will; and would be absent for more than 4 days month.[260] He opined that Plaintiff's symptoms would frequently interfere with attention and concentration; that she could occasionally carry less than ten pounds and could rarely carry ten pounds.[261] He opined that Plaintiff could never do the following: bending, stooping, squatting, crouching, kneeling, and crawling.[262] He also opined that Plaintiff could rarely climb stairs, reach above the shoulders, or reach to floor level; and could occasionally handle and finger or reach to waist level.[263] He opined that Plaintiff's impairments began in 2014 and were chronic, that she was not a malingerer, and that she could perform her past work with accommodations and other work that met the restrictions.[264]

---

[259] AR 761-762.

[260] AR 761.

[261] AR 762.

[262] *Id.*

[263] *Id.*

[264] *Id.*

Dr. Bulfinch's opinions were not accompanied by the same explanation provided by Dr. Mannava.  The sole explanation of his diagnosis that Plaintiff's skin was a little stretchy is of itself not sufficient to explain the basis of his opinion. Moreover, Dr. Bulfinch's opinions were inconsistent with the record as a whole.

It is notable that Dr. Bulfinch initially based his diagnosis of Ehler's-Danlos syndrome on nothing more than Plaintiff's subjective reports.[265]  Ms. Ball, Dr. Beck, and Ms. Hayes all declined to diagnose Ehler's Danlos syndrome.[266] Both PA Price and Dr. Beck found that there was no evidence of hypermobility in Plaintiff's joints.[267]

The Court concludes that Plaintiff's arguments as to the ALJ's finding that Dr. Bulfinch's opinions were lacking in supportability and consistency is without merit.  Additionally, to the extent that the Court has remanded the case for consideration of Dr. Mannava's opinions, the ALJ is required to reconsider the medical opinions in general.

5.    Summary

Because the ALJ did not give good reasons for her evaluation of the medical opinions of Dr. Mannava, a remand is warranted.

---

[265] AR 741.

[266] AR 635-636, 647,774-775.

[267] AR 585-586, 773.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**C.      Step Five: The Court Finds the Issue Moot**

Plaintiff argues the ALJ erred at step five.  As discussed above, the ALJ failed to properly evaluate Plaintiff's subjective complaints and the medical opinions of Dr. Mannava. Because the ALJ will be require to reevaluate the medical evidence and all testimony on remand, the Court finds this issue to be moot.

**D.      Remand for Further Proceedings**

Plaintiff submits a remand for payment of benefits is warranted. The decision whether to remand a case for additional evidence, or simply to award benefits, is within the discretion of the court."[268] When the court reverses an ALJ's decision for error, the court "ordinarily must remand to the agency for further proceedings."[269]

---

[268] *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987) (citing *Stone v. Heckler*, 761 F.2d 530 (9th Cir. 1985)).

[269] *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017); *Benecke*  379 F.3d at  595 ("[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation"); *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014).

### IV.    Conclusion

Plaintiff establishes the ALJ erred. On remand, the ALJ is to develop the record and reevaluate—with meaningful articulation and evidentiary support—the sequential process.

Accordingly, **IT IS HEREBY ORDERED**:

1.    The ALJ's nondisability decision is **REVERSED**, and this matter is **REMANDED** to the Commissioner of Social Security for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

2.    The Clerk's Office shall **TERM** the parties' briefs, **ECF Nos. 8 and 13**, enter **JUDGMENT** in favor of **Plaintiff**, and **CLOSE** the case.

IT IS SO ORDERED. The Clerk's Office is directed to file this order and provide copies to all counsel.

DATED this 10th day of April, 2024.

_Edward F. Shea_

EDWARD F. SHEA
Senior United States District Judge